COMMONWEALTH *vs.* GEORGE MCGRATH
(and a companion case [1]).

Suffolk.   October 5, 1970. — December 8, 1970.

Present: SPALDING, CUTTER, KIRK, SPIEGEL, & QUIRICO, JJ.

*Homicide. Insanity. Practice, Criminal,* Trial of defendants together, Judicial discretion.

Evidence respecting guns possessed by, and the activities of, two defendants shortly before and after the owner of a drug store and his nephew were found with fatal gunshot wounds in their heads behind its counter and near its cash register at the close of a business day warranted conviction of both defendants of murders in the first degree of the store owner and his nephew during the course of an armed robbery or attempted robbery, even though there was no eyewitness account of what took place in the store and no proof that money was stolen. [318–319]

At a murder trial in which the defence was insanity and there was psychiatric testimony and testimony by the defendant as to his use of drugs and alcohol, culminating in his heavy use thereof on the day preceding and the day of the crimes, the charge of the judge, including a statement as to nullification of the defence if the defendant's use of drugs or alcohol was voluntary, correctly applied the principles of *Commonwealth* v. *McHoul,* 352 Mass. 544, and *Commonwealth* v. *Taylor,* 263 Mass. 356. [320]

At a joint trial of two defendants for murders by shooting, there was no merit in a contention by one defendant that if the second defendant actually fired the shots but was acquitted by reason of insanity, or if it could not be determined which of the defendants fired the shots and the second defendant was legally insane, the first defendant could not be found guilty of murder. [321]

[1] Commonwealth *vs.* Paul G. Robinson.

At a joint trial of two defendants for murders by shooting, where the
judge limited testimony by the owner of the gun used to one de-
fendant and limited to him statements by him after the crimes con-
cerning flight, and there were no oral statements by him implicating
the second defendant, there was no error or abuse of discretion in the
denial of a motion for a severance by the second defendant. [321]

Where there was evidence at a trial for murders by shooting that on the
night of the crimes the defendant was in possession of the gun used,
there was no error in the admission of testimony concerning an at-
tempt by a companion of the defendant to dispose of a different gun
down a sewer. [322]

INDICTMENTS found and returned in the Superior Court
on January 17, 1969, and January 24, 1969.

The cases were tried before *Hennessey,* J.

*Edward M. Sullivan* for the defendant Robinson.

*James A. O'Donovan* for the defendant McGrath.

*John T. Gaffney,* Assistant District Attorney, for the
Commonwealth.

KIRK, J. At a trial subject to G. L. c. 278, §§ 33A–33G,
the defendants George McGrath and Paul G. Robinson were
respectively found guilty on indictments charging each with
murder in the first degree (two indictments against each)
and assault with intent to rob (two indictments against each).
On the murder convictions the jury recommended that the
death penalty be not imposed. The cases are before us on
the defendants' appeals with summaries of the record, a
transcript of the evidence, and assignments of error.

The argued assignments of error relate to the denials of
the motions of both defendants for directed verdicts, to the
denial of Robinson's motion for a severance, to the refusal
to give certain instructions requested by the defendants,
and to instructions given by the judge.

We summarize the evidence, as culled and synthesized by
us from the fragments scattered throughout the several
volumes of testimony.

On December 21, 1968, at approximately 7:45 P.M.,
Patrick A. Hughes, aged sixty-five, and his nephew Patrick A.
Hughes, aged twenty-seven, were found on the floor of the
elder Hughes' drug store in Roxbury. They were lying, one
on top of the other, behind the counter. Both had severe

gunshot wounds in the head. The sound of gunshots was heard by a witness who was in the Mission Church across the street from the drug store, a few minutes before 7:45 P.M. There was no eyewitness testimony of the actual shooting. There was no evidence of anything having been stolen. The younger Hughes died en route to the hospital. The elder Hughes died six days later.

A ballistics expert testified that the bullet which was removed from the head of the elder Hughes was fired from a .22 caliber revolver. The .22 caliber bullet which had been removed from the brain of the younger Hughes was so badly distorted as to preclude its identification with the .22 caliber revolver.

About five minutes before the shooting the defendant Robinson was seen by a witness who had known him for about ten years, in a doorway about two doors from the drug store. Robinson was with another man. As the witness passed, he said, "Hi, Paul" and Robinson responded, "Hi, John." The other man in the doorway was not the defendant McGrath.

A police officer assigned to the Roxbury division, while responding to a call to go to the drug store about 8 P.M. on December 21, 1968, saw a red and black Chevrolet turn into Parker Street from Tremont Street. The vehicle had three occupants. Robinson was in the front seat on the passenger's side.

Robinson, McGrath and one John McNeil[2] were seen by a witness (Mahoney) at the Pond Cafe in the Hyde Square area of Jamaica Plain about one hour before the fatal shooting and were again seen by Mahoney upon Mahoney's return to the cafe about forty-five minutes after the shooting. Shortly after 8:30 P.M., Robinson, McGrath, McNeil and Mahoney went to a liquor store in Jamaica Plain in McGrath's car. McGrath's car was a red 1966 Chevrolet with a black vinyl top. Mahoney and Robinson went into the store to make a purchase. As they were reëntering the

---

[2] McNeil was indicted but was not tried.

car Mahoney saw a .22 caliber revolver fall from Robinson's pocket. The .22 caliber revolver had been borrowed by McGrath from one Jordan on December 19, 1968, two days before the slayings. Eight or nine days after the crimes the weapon was returned to Jordan by McGrath and McNeil. Eventually it came into the hands of the police and was in evidence as an exhibit.

About 10:30 P.M. on the night of the crimes, Robinson, McGrath and McNeil went to an apartment in Dorchester occupied by McNeil's girl friend and her roommate. Three weapons were placed on the coffee table in the middle of the room. Shortly after the eleven o'clock television news broadcast started, Robinson and McGrath told the group in another room that the younger Hughes had died and that the older man was in critical condition. One of the guns on the table was the .22 caliber revolver. Another of the guns was one which had been seen by the witness Mahoney in McGrath's car on the evening of December 21, 1968, when Mahoney rode with Robinson, McGrath and McNeil to a liquor store shortly after 8:30 P.M. It was the same gun Mahoney had seen in McNeil's possession a week before the crime at the Pond Cafe.[3] The third gun was a shotgun. It had previously been seen by the witness Jordan in the trunk of McGrath's car when McGrath borrowed the .22 caliber revolver from Jordan. At that time, McGrath told Jordan that the shotgun "was a handy baby to have around."

Robinson was arrested on January 2, 1969, at his girl's apartment in East Boston. A box of .22 caliber cartridges was seized at the time of his arrest. The bullets were capable of being fired from the .22 caliber revolver.

On or about January 8, 1969, McGrath planned to visit relatives in Pennsylvania. On January 11, McGrath said that he and McNeil were going to Pennsylvania but that he would return later that night. On January 12, McGrath said he did not want McNeil to go along because it would

---

[3] McNeil and his girl friend early in January, 1969, dropped this gun into a sewer in the Dorchester — Mattapan area.

make it difficult for McGrath if he "got caught" to explain why he was there.

1. There was no error in denying the defendants' motions for directed verdicts.

In order to prove first degree murder, the Commonwealth proceeded on the theory that the Hughes men were killed in the course of an armed robbery. At common law, a homicide committed in the commission or attempted commission of a felony is murder. *Commonwealth* v. *Chance*, 174 Mass. 245, 252. *Commonwealth* v. *Madeiros*, 255 Mass. 304, 310, 315. By statute, murder committed in the commission or attempted commission of a crime punishable by death or life imprisonment is murder in the first degree. G. L. c. 265, § 1. *Commonwealth* v. *Balliro*, 349 Mass. 505. Armed robbery is punishable by life imprisonment.

The defendants contend that since there was no eyewitness account of what took place in the drug store, and no money was proved to have been taken, there could be no inference drawn that a robbery was attempted and that, consequently, the felony murder rule could not be applied. We disagree.

From the evidence we have recounted, an inference could reasonably be drawn that the defendants shot the two men while engaged in an armed robbery or attempted robbery. Both defendants had procured and were armed with guns on the night of the crime. Robinson was in a doorway just two doors from the drug store five minutes before the murders. Fifteen minutes later he was seen near the drug store in a car similar to that operated by McGrath. Approximately an hour after the crime, Robinson was in possession of the revolver which was proved to have been the one that killed the elder Hughes. The jury could reasonably infer that the same weapon was the one used to kill the younger Hughes.

Although proof of motive is not required there was no indication of any motive for the killings other than robbery. See *Commonwealth* v. *Nassar*, 354 Mass. 249, 265. The victims had been engaged in their business all day. The

younger Hughes moments before had been mopping the floor, inferably a closing up chore. The shootings took place toward the close of the business day when the total receipts were at hand. The bodies were behind the counter near the cash register.

There was also sufficient evidence to connect McGrath with the killings as a principal, aiding and abetting the actual perpetrator, Robinson, in a common criminal enterprise. McGrath was seen in the company of Robinson shortly before and after the shootings. McGrath obtained and returned the weapon that killed the Hughes men. A vehicle similar to McGrath's was seen near the crime fifteen minutes after it occurred. Robinson and two others were in it. McGrath's statement concerning flight to Pennsylvania was evidence of consciousness of guilt and thus of guilt itself. The trial judge rightly submitted the case to the jury based on the felony murder rule. See *Commonwealth* v. *Nassar,* 354 Mass. 249, 265; *Commonwealth* v. *White,* 353 Mass. 409, 413, 421–425.

2. Robinson assigns as error the refusal of the judge to give certain requests on the issue of sanity and charging the jury that the defence of insanity was not available to Robinson if they found the insanity was caused or induced (even if only in part) by his voluntary use of drugs or alcohol. Robinson also alleges error in the judge's instruction that in determining whether Robinson was sane at the time of the crime the jury could consider that the majority of men are sane. We have recently upheld such a charge in *Commonwealth* v. *Francis,* 355 Mass. 108, and again in *Commonwealth* v. *Ricard,* 355 Mass. 509. We do not depart from the principles enunciated in those cases.

As background to the instructions which the judge gave to the jury we cite some of the testimony offered by Robinson on the issue of insanity. An expert in psychiatry testified that, in his opinion, Robinson suffered from psychosis but until the time he took certain drugs on the day of the murders, he could appreciate the criminality of his conduct and was able to conform his conduct to the law. Other psychi-

atric testimony was that he was alert, in good contact, answered relevantly and coherently, and had a good memory and that there was no evidence of mental disease.

Robinson testified that he had a history of taking drugs, beginning with "sniffing glue" at the age of thirteen until he went on a "drug bender" for a couple of weeks before December 21, 1968. He had experienced "blackouts" from drugs or drinking about three years before 1969. Robinson testified that on December 20, 1968, he took heroin, liquor, marihuana and LSD. On the morning of December 21, he took ten pills of biphetamine, was sick, "speeding and coming down." He was in the Pond Cafe all that afternoon, drank about ten vodka and 7-up drinks and smoked a couple of marihuanas. About 6:30 P.M. he injected heroin into his arm and that is the last he remembered until he awoke on the morning of December 22.

The judge correctly instructed the jury on the voluntary use of intoxicating drugs and alcohol. His charge in pertinent part is as follows: "Further, I instruct you that if you find that Robinson had an underlying mental disease or illness but that despite such underlying mental disease he had the substantial capacity to appreciate the wrongfulness (criminality) of his conduct and had the substantial capacity to conform his conduct to the requirements of the law, and if you further find that, by reason of and because of his voluntary use of drugs or drugs and alcohol on the day of the crimes or the few days before the crimes, he lost his substantial capacity to appreciate the criminality of his conduct or the substantial capacity to conform his conduct to the requirements of law, you would then, having made all these findings, be warranted in returning verdicts of guilty against Robinson if you found he participated in the crimes." This charge was a correct application of the principles of *Commonwealth* v. *McHoul*, 352 Mass. 544, and *Commonwealth* v. *Taylor*, 263 Mass. 356, 363. See *Commonwealth* v. *Delle Chiaie*, 323 Mass. 615, 618.

There was evidence in contradiction of Robinson's testimony of his condition. The issue was properly left to the jury.

3. The defendant McGrath also excepts to the judge's charge on the basis that if Robinson was acquitted by reason of insanity, McGrath could not be found guilty of murder. McGrath argues that if the person who actually fired the shots was legally insane or it could not be determined who fired the shots and one of the participants was legally insane, then McGrath cannot be held to any greater degree of responsibility than the insane participant. The defendant claims that there is no authority "one way or another" on the proposition.

Obviously the proposition is without merit either in law or in reason. It is rarely advanced and should never be tolerated. The insanity of one defendant may not serve as a shield for the acts of a responsible person. In *Tucker* v. *Hyatt*, 151 Ind. 332, 336, the defendants contended that the insanity of a coconspirator precluded the remaining defendants from being convicted. The court said: "No man can shield himself from liability for his wrongful acts on the ground that the person who assisted in carrying out and executing his wrongful purpose, or the wrongful purpose of himself and others, was a person of unsound mind." Similar reasoning was applied in *United States* v. *Gooding*, 12 Wheat. 460, 469.

4. There was no error in the trial judge's refusal to grant Robinson's motion for severance. The judge gave meticulous instructions to the jury limiting the testimony by the owner of the .22 caliber revolver to McGrath and limiting the statements concerning McGrath's flight to Pennsylvania to him. A motion for severance is within the discretion of the trial judge, unless severance is required by constitutional principles. *Commonwealth* v. *Carita*, 356 Mass. 132. *Commonwealth* v. *French*, 357 Mass. 356, 371. Since there were no oral statements by McGrath implicating Robinson, the rule of *Bruton* v. *United States*, 391 U. S. 123, is inapplicable.

Even if McGrath's statements concerning flight to Pennsylvania might reflect adversely on Robinson, we made it clear in *Commonwealth* v. *French, supra,* at p. 373, that

"[w]e do not view the *Bruton* case as preventing introduction, in a joint trial, of out-of-court admissions by one defendant which only incidentally and indirectly reflect adversely on another defendant." Similarly, there was no error in the admission of testimony concerning McNeil's attempt to dispose of a gun down a sewer. There was evidence that Robinson was in possession of the .22 caliber revolver on the night of the crime. The fact that one of Robinson's companions carried a different gun did not prejudice him. See *Commonwealth* v. *Sullivan*, 354 Mass. 598, 616, and *Commonwealth* v. *McLaughlin*, 352 Mass. 218, 229–230.

Having reviewed the entire transcript, we discern no reason to exercise the powers conferred upon this court by G. L. c. 278, § 33E (as amended through St. 1962, c. 453).

*Judgments affirmed.*