COMMONWEALTH vs. ROBERT J. SHELLEY.

Norfolk. May 7, 1980. — August 21, 1980.

Present: HENNESSEY, C.J., KAPLAN, WILKINS, & LIACOS, JJ.

*Homicide. Insanity. Practice, Criminal,* Capital case, Examination of
jurors.

At a criminal trial, there was sufficient evidence to warrant a finding
that the defendant was criminally responsible for his conduct; the jury
were not required to accept expert testimony that the defendant was
insane at the time of the crime, even if such testimony were uncon-
tradicted. [345-348]

At a murder trial, although the judge's instructions with respect to the
connection between voluntary alcohol consumption and a latent men-
tal disease or defect unrelated to alcohol use were inadequate, there
was no substantial risk of a miscarriage of justice where the evidence
did not fairly raise the issue whether alcohol use activated the defend-
ant's latent mental disease. [348-351]

At the trial of a defendant charged with a gruesome murder of a homo-
sexual, in which the defendant introduced a defense of insanity, the
judge was not required by G. L. c. 234, § 28, to conduct an individual
voir dire of the jurors and did not abuse his discretion in refusing to do
so. [351-353]

This court declined to exercise its powers under G. L. c. 278, § 33E, to
order a new trial in a murder case on the basis that the jury should
have been allowed to consider whether the defendant's mental illness
deprived him of substantial capacity to premeditate the murder and to
appreciate the consequences of his extremely atrocious or cruel acts
where the case was tried before this court's decision in *Commonwealth
v. Gould,* 380 Mass. 672 (1980), where the defendant had no prior
psychiatric history, and where his defense counsel did not seek a
charge on these issues and took no exception to the judge's failure to in-
struct the jury that they might consider the defendant's mental state on
these issues. [354-355]

INDICTMENT found and returned in the Superior Court on
October 3, 1975.

After review reported at 374 Mass. 466 (1978), the case was retried before *Chmielinski, J.*

*Stephen A. Saltzburg (Harvey E. Bines* with him) for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. Indicted on October 3, 1975, for the murder of William C. Dubbels, the defendant Shelley was convicted on July 23, 1976, of murder in the first degree. He was sentenced to life imprisonment. On February 23, 1978, this court reversed the conviction and remanded the case for a new trial. *Commonwealth* v. *Shelley,* 374 Mass. 466 (1978). The second trial, which commenced on November 29, 1978, resulted again in conviction for murder in the first degree and a sentence of life imprisonment pursuant to G. L. c. 265, § 2. Shelley appeals to this court pursuant to G. L. c. 278, §§ 33A-33G. We affirm.

The evidence put before the jury indicates that the murder occurred on September 3, 1975. Dubbels managed a Needham grocery store where Shelley worked. On September 2, about 11:30 P.M., Shelley and three others left the store to visit Dubbels at home in Franklin. When he arrived in Franklin, Shelley had had between one and nine beers. At no time during the evening did Shelley appear intoxicated. When Dubbels answered his doorbell, he was dressed in a bathrobe. He reached out, grabbed Shelley and pulled him into the house. The group talked and drank together until about 2 A.M. During the evening, Dubbels expressed interest in having sexual relations with Shelley, but Shelley laughed it off. Dubbels asked Shelley to stay the night and offered him a ride to work the next morning. Shelley agreed, but asked if one of the others could also stay. Dubbels said no, and the others left.

What next transpired we learn primarily from statements Shelley gave to the police and various expert witnesses. The statements are not wholly consistent, but generally, for our purposes, the differences are not material. It appears that Shelley went upstairs and took a shower. When Shelley

emerged from the shower, Dubbels invited Shelley to sleep in his room. Shelley put his pants on. Dubbels told Shelley to take them off, but Shelley did not. They lay together on the bed with the lights out. When Shelley was half-asleep or half-passed-out, Dubbels made a sexual advance toward him. Shelley pushed Dubbels away, got up, put his boots on, and went downstairs "to get a drink." He may have had a drink at that point. He debated whether to leave or go back upstairs. He located a meat cleaver and a "hot dog" fork in a kitchen drawer; he went upstairs, and put out the bathroom light so Dubbels would not see the light gleam on the cleaver. Shelley sat down on the bed. Dubbels put his arm around him, and Shelley began striking Dubbels with the cleaver. As Shelley gripped Dubbels in a headlock and hacked at him, Dubbels cried out, "What are you doing?" Shelley said, "I'm killing you," or, "I think I'm killing you." Dubbels said, "You can't do that." But the assault went on. As Dubbels tried to resist, Shelley put him in a chokehold, and Dubbels fell backward, landing on Shelley. Shelley got out from under, turned the light on, and apparently went at Dubbels again, first with the cleaver and next with the fork. He left the bent fork stuck in the side of Dubbels' head. Dubbels was still breathing. Then Shelley jumped on Dubbels' head repeatedly. At some point during the incident, Shelley claimed he began to feel that he was not the one doing the killing.

Shelley telephoned certain friends and the police. He also rummaged through Dubbels' possessions, looking for money. The police arrived, surveyed the scene, arrested Shelley, gave him Miranda warnings, and took his statement. He gave a longer statement at the police station. An autopsy revealed that Dubbels had died from loss of blood from multiple incised stab wounds.

At Shelley's second trial, there was no dispute that he had killed Dubbels. The only question was whether he was criminally responsible. The Commonwealth's psychiatrist, Dr. John Kluznik, testified that Shelley was criminally responsible within the meaning of the test set out in *Com-*

*monwealth* v. *McHoul*, 352 Mass. 544 (1967). According to this witness, Shelley belonged to the diagnostic category of "borderline personality . . . disorder," a condition in which a person may be capable of appreciating the wrongfulness of his conduct. Shelley had not had psychiatric treatment prior to the killing.

During the attack on Dubbels, Shelley allegedly experienced a "dissociative reaction"; i.e., he felt as if he were not the one striking Dubbels. Dr. Kluznik characterized this claimed reaction as a "mental disease or defect" for purposes of the *McHoul* test. Questioning focused on the timing and the cause of the reaction. Dr. Kluznik fixed the onset of the dissociative state midway through the attack, either when blood first hit Shelley in the face or when Shelley stopped the attack, turned on the light, and began again. The doctor maintained that at least three aspects of Shelley's thought process and behavior before the attack began were inconsistent with a diagnosis of dissociative state: (1) his decision to leave the bed and go downstairs after the first sexual advances by Dubbels; (2) once downstairs, the thoughts, "Leave? Get him back? I was not sure"; and (3) putting out the bathroom light so Dubbels would not see the weapons. The doctor described Shelley's actions as having "the methodical not irrational, not driven quality of someone who is insane but more a quality of hatred and vengeance."

Dr. Kluznik testified that dissociative reaction is usually associated with extreme fright, panic, or anxiety, and that one need not be psychotic to enter a dissociative state. The doctor admitted the possibility that Shelley suffered from "homosexual panic" resulting from Dubbels' advances, but he pointed out that other rage or panic states could generate the reaction. According to Dr. Kluznik, Shelley hated homosexuals, felt rage toward them, and wished to do them violence. Shelley's borderline personality would be the basic cause of the dissociative state. Consumption of alcohol, Dr. Kluznik testified, was an indirect cause of Shelley's reaction. "[A]lcohol provides a loosening of inhibitions, the

inhibitions that control rage and the inhibitions that control aggressive attack. Once those mechanisms are set into motion, a person can become frightened and dissociative reaction can result." In response to a question by the judge, the doctor agreed that "the defendant had a latent condition of one sort or another which was exacerbated by the excessive use of alcohol."

On cross-examination, defense counsel questioned Dr. Kluznik about a progress note the doctor had written on July 14, 1976. The note stated that Shelley had had a dissociative reaction during the time of the killing and the reaction would have rendered him not criminally responsible. The note goes on to say, "It should be pointed out, however, that the dissociative reaction would probably not have occurred had he not been drinking that night. In my understanding, the voluntary consumption of alcohol precludes the right to the use of the insanity defense and it is on the basis of that understanding that I reach the opinion that Mr. Shelley should be considered criminally responsible at the time of the incident offense." On further cross-examination, the doctor said that he had modified his opinion since the time he wrote the note. He remarked that the dissociative state had occurred during some part of the time of the offense and that the offense occurred over a significant period of time.

The defense presented three expert witnesses, two of whom expressed no opinion about Shelley's criminal responsibility at the time of the crime. Dr. Stephen G. Cronin, a psychiatrist, testified that he had examined Shelley on August 17, 1977, at the Massachusetts Correctional Institution at Bridgewater and that, in response to the doctor's staged remark, "Gee, what would you think if I kind of thought you were cute?" Shelley became psychotic. In a later examination, Dr. Cronin concluded that Shelley suffered "paranoid illusions" focusing on homosexuality. Dr. Jonathan H. Slavin, a clinical psychologist, testified that he administered various diagnostic tests to Shelley. Dr. Slavin concluded that Shelley had a paranoid personality, that he

was hyperattentive to details, that he tended to lose his tenuous self-control when his masculinity was threatened, and that he was of bright normal intelligence.

Finally, Dr. Laurence C. Salvesen, a psychiatrist, testified that Shelley suffered from a borderline paranoid personality or latent schizophrenia. This expert testified that Shelley tended to view people as all good or all bad, and feared and denied his own homosexual feelings and viewed homosexuals as subhuman. Dr. Salvesen said that from the moment of Dubbels' sexual advance, Shelley entered a psychotic dissociative state and had a "primitive" asocial reaction: a feeling that he had to fight or flee. In Dr. Salvesen's opinion, Shelley was in the grips of homosexual panic, and lacked substantial capacity to appreciate the wrongfulness of his conduct. Shelley's pride at the killing and his activities after the incident were viewed by the witness as consistent with this opinion. Finally, Dr. Salvesen concluded that Shelley was not intoxicated during the incident. According to the doctor, if Shelley had been intoxicated, the alcohol could have facilitated a dissociative reaction without necessarily causing it.

Shelley attacks his conviction on four grounds: first, he argues that, as a matter of law, he is not guilty by reason of insanity; second, he contends that the judge erred in instructing the jury relative to the impact of alcohol consumption on an insanity defense; third, Shelley asserts that the judge erred in failing to conduct an individual voir dire of the jurors; and finally, the defendant asks us to exercise our powers under c. 278, § 33E, and reduce his conviction to voluntary manslaughter or grant a new trial.

1. Shelley's argument that the evidence of criminal responsibility is insufficient as a matter of law [1] raises an issue not presented at the trial. Shelley did not move for a directed verdict of not guilty by reason of insanity. In his reply brief, Shelley cites *Jackson* v. *Virginia*, 443 U.S. 307

---

[1] Shelley does not question the sufficiency of the evidence of first degree murder in any other respect.

(1979), for the proposition "that a case in which guilt is not proved beyond a reasonable doubt presents a fundamental constitutional question and not a mere point of evidence or procedure." Because we believe that the evidence on Shelley's criminal responsibility was sufficient as a matter of law, we assume, arguendo, that the issue is properly before us and do not consider his constitutional argument.

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). "We must determine whether the Commonwealth's evidence, 'considered in its light most favorable to the Commonwealth, was sufficient to permit the jury to infer the existence of [criminal responsibility],' . . . and 'to bring minds of ordinary intelligence and sagacity to the persuasion of . . . [guilt] beyond a reasonable doubt.'" *Commonwealth* v. *Rhoades*, 379 Mass. 810, 815 (1980) (citations omitted).

According to Shelley, Dr. Kluznik's testimony was the only possible evidence that he was sane at the time of the homicide; but Shelley argues that Dr. Kluznik had reached a medical opinion that Shelley was not mentally competent. As Shelley has it, Dr. Kluznik testified that Shelley suffered from mental illness and that during the attack he experienced a dissociative state. In Shelley's view, Dr. Kluznik testified as he did because he misunderstood the law; he stated that the "voluntary consumption of alcohol precludes the right to the use of the insanity defense." Only this legal misunderstanding,[2] Shelley maintains, prevented Dr. Kluznik from accepting the three defense experts' "unanimous" opinion that Shelley was not criminally responsible. Shelley puts forward his own view of the law: "a criminal defendant is not criminally responsible if he suffers from a mental

---

[2] We note that no objection or motion to strike Dr. Kluznik's opinion was made on this basis.

disease or defect induced by alcohol voluntarily consumed so long as (1) the alcoholic condition is not the disease or defect on which he relies, and (2) the defendant did not know, or have reason to know, that such disease or defect would result from consumption of alcohol." Shelley asserts that there is no evidence to bring him within one of these two exceptions. Thus, he concludes, the evidence of sanity was insufficient as a matter of law.

We cannot agree. The jury were not obliged to believe the testimony of any of the expert witnesses. See, e.g., *Commonwealth* v. *Gould,* 380 Mass. 672, 679 (1980); *Commonwealth* v. *Shelley,* 374 Mass. 466, 474 (1978). Shelley seeks to avoid the force of this principle by arguing that Dr. Kluznik and the defense experts are in medical agreement. The defendant contends that, without an evidentiary basis, a jury cannot reject unanimous expert opinion on a matter not within their ordinary experience.

Shelley's argument is incorrect. The jury need not accept uncontradicted expert testimony that the defendant was insane at the time of the murder. *Commonwealth* v. *O'Brien,* 377 Mass. 772, 779-780 (1979). *Commonwealth* v. *Kostka,* 370 Mass. 516, 536 (1976). However, even if we were to assume, arguendo, that Shelley's argument is correct, Shelley's contention that all experts agree is a distortion of the record. As we indicated, in considering the sufficiency of the evidence, we consider the Commonwealth's evidence in the light most favorable to the Commonwealth. Dr. Kluznik's statement that voluntary alcohol consumption precludes the right to use the insanity defense appears in his July, 1976, progress note and was introduced by the defense to impeach his testimony. So was his statement that Shelley's dissociative reaction occurred "during the attack." The doctor stated that he had changed his opinion since filing that progress note. Indeed, Dr. Kluznik repeatedly said that Shelley's dissociative state began midway through the attack and that Shelley's actions before the attack seemed to be rational.[3] He testified clearly and unequivocally that,

---

[3] In his reply brief, Shelley states: "Dr. Kluznik's testimony is conclusive because he fixes onset of the dissociative state at when Shelley began strik-

up to that point at least, Shelley was criminally responsible. Thus, contrary to Shelley's assertion, Dr. Kluznik did not agree with the defense experts. And only one, not all three, of the defense experts expressed an opinion about Shelley's criminal responsibility.[4] If the jury simply believed Dr. Kluznik's stated opinion at the time of the trial, they could have concluded that Shelley was criminally responsible. To reach this conclusion, they need not have based their decision on Shelley's alleged consumption of alcohol. We conclude there was sufficient evidence to uphold the verdict.

2. Shelley's second argument is that the judge's instruction[5] about the connection between alcohol consumption

ing the victim with weapons. . . . Dr. Kluznik's testimony alone establishes the critical link between the killing attack and Shelley's insanity." In support of this assertion, Shelley points to Dr. Kluznik's remark that the dissociative state began "as he was wielding the cleaver and the blood . . . was striking him in the face." Shelley understands this remark to imply that the onset of the dissociative state followed immediately after the first blows with the cleaver. He then attempts to force other statements from Dr. Kluznik to conform with this theory.

Even if we assume, arguendo, that Dr. Kluznik's testimony does fix the onset of the dissociative state just after the first cleaver blows, the evidence of criminal responsibility is sufficient. The jury were not required to accept any of the experts' versions of the event, nor did they have to accept any of Shelley's statements on which all experts relied in part as accurate descriptions of the murder. Furthermore, the jury could have concluded that the first cleaver blows were the fatal ones. Dubbels died from loss of blood, and there was no testimony that the blows causing death occurred midway through the attack.

[4] An expert testifying on the issue of a defendant's criminal responsibility need not frame his testimony in terms of the *McHoul* test, a legal standard. Testimony in purely medical or psychological terms may in many instances be preferable; the expert may be best equipped to use medical or psychological concepts, and the testimony may not fit neatly in legal categories. The jury, correctly instructed, can then apply the legal standard to the medical and psychological testimony. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 550 (1967). On the other hand, if reference to a legal standard is to be made, counsel properly would be required to ask the expert to cast his opinion in terms of the legal standard set out in *McHoul*.

[5] The jury submitted a question concerning the relationship between voluntary alcohol use and criminal responsibility. The judge answered, in pertinent part: "Now, if you find that Shelley had an underlying men-

and the *McHoul* test was erroneous. According to Shelley, voluntary alcohol consumption does not foreclose reliance on an insanity defense so long as the alcoholic condition is not the mental disease or defect relied on and the defendant neither knew nor should have known that alcohol use would cause the disease or defect.

We need not reach this argument, for the issue was not before the judge. At trial, former defense counsel asked the judge to insert the word "only," so that the instruction would read, "if you further find that only by reason of and because of his voluntary use of alcohol . . . ." Having taken his instruction almost verbatim from *Commonwealth* v. *McGrath,* 358 Mass. 314, 320 (1970), the judge refused to make the change. Former defense counsel excepted without further argument.

We do not think that the request to insert the word "only" raised more than the merest shadow of the argument now put forward. As we said in *Commonwealth* v. *Johnson,* 374 Mass. 453, 465 (1978), "Neither the coventional type of appellate review permitted in a criminal case, nor the special type prescribed by G. L. c. 278, § 33E, for a 'capital case,' is intended to afford an opportunity, from the vantage point of hindsight, to comb the trial record for interesting questions which could have been, but in fact were not, raised at the trial, or to attempt to convert the consequences of unsuccessful trial tactics and strategy into alleged errors by the judge." Nevertheless, we would exercise our powers under § 33E if the record furnished an evidentiary basis for Shelley's argument, G. L. c. 278, § 33E, or if it raised a substan-

---

tal disease or illness but that despite such underlying mental disease he had the substantial capacity to appreciate the wrongfulness or criminality of his conduct and had the substantial capacity to conform his conduct to the requirements of the law, and if you further find that by reason of and because of his voluntary use of alcohol on the night of the crime or the few hours before the crime he lost his substantial capacity to appreciate the criminality of his conduct or the substantial capacity to conform his conduct to the requirements of law, you would then, having made all these findings, be warranted in returning a verdict of guilty against Shelley if you found that he in fact committed this crime."

tial risk of miscarriage of justice. *Commonwealth* v. *Freeman,* 352 Mass. 556, 561 (1967). The judge's instruction, taken from *Commonwealth* v. *McGrath, supra,* did not treat adequately the situation in which voluntary alcohol consumption unforeseeably activates a latent mental disease or defect unrelated to alcohol use. The present record, however, does not contain evidence fairly raising that issue. See *Commonwealth* v. *Bowden,* 379 Mass. 472, 483 (1980).[6]

The record does contain evidence that Shelley had a latent mental disease or defect unrelated to alcohol use. If there had been evidence that voluntary alcohol use activated the mental disease, so that at the time of the killing Shelley had lost the substantial capacity to appreciate the wrongfulness of his conduct, we might agree that the jury would not have been warranted in finding Shelley guilty unless Shelley knew or had reason to know that the alcohol would activate his illness.[7] In fact, none of the experts gave testimony that Shelley's alcohol consumption made operative a latent mental disease which deprived him of substantial capacity at the time of the killing. The defense expert, Dr. Salvesen, testified that Shelley's alcohol consumption did not affect his

---

[6] This deficiency is not surprising. The defendant's trial counsel did not put forward the theory argued on appeal. Instead of arguing that alcohol consumption triggered a latent disease, trial counsel took pains to show that alcohol did not affect the defendant's mental state. Moreover, the defendant's theory on appeal neither appeared in our case law at the time of trial, nor followed directly from cases then decided. At best, the defendant's theory rests on dicta in cases decided after the trial. *Commonwealth* v. *Sheehan,* 376 Mass. 765 (1978); *Commonwealth* v. *Johnson,* 374 Mass. 453, 460-465 (1978). At the time of trial, the case most nearly apposite was *Commonwealth* v. *McGrath,* 358 Mass. 314, 320 (1970), on which the judge relied.

[7] This view is consistent with our position in *Commonwealth* v. *Sheehan, supra.* There we said that drug addiction is not a mental disease or defect under the *McHoul* standard and that the normal consequences of drug addiction are not a basis for relieving a defendant of criminal responsibility. After recognizing situations in which a drug addict can avoid criminal responsibility, we said, "[W]here the defendant voluntarily consumes drugs *knowing that such consumption will cause a mental disease or defect,* a finding of lack of criminal responsibility would not be warranted" (emphasis supplied). *Id.* at 770.

behavior, only that alcohol use could facilitate a dissociative state without necessarily causing it. Dr. Kluznik testified that Shelley was not suffering from a mental disease or defect until midway through the attack. Thus, even though he testified that Shelley's alcohol use may have "exacerbated" a latent defect, he did not testify that the alcohol use caused the latent defect to become active before the time of the killing.[8] Because the evidence did not fairly raise the issue whether alcohol use activated Shelley's latent mental disease, we find no substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman, supra.*

3. Shelley argues that G. L. c. 234, § 28,[9] mandated that the trial judge conduct individual voir dire of the jurors. He further argues that, even if the judge was not required to conduct individual voir dire, failure to do so constituted an abuse of discretion. The judge ordered that the jurors be called to fill the jury box. As a group of potential jurors took their places in the box, with the remaining members of

---

[8] In the July 14, 1976, progress note, Dr. Kluznik did suggest that, but for Shelley's alcohol consumption, he was not criminally responsible at the time of the killing, an opinion he repudiated in his trial testimony. However, as Shelley points out, the basis for that extrajudicial remark was the doctor's understanding of the law. In any event, Dr. Kluznik's note did not imply that Shelley's alcohol use activated a latent mental disease which rendered him insane at the time of the killing.

[9] General Laws c. 234, § 28, as amended through St. 1975, c. 335, provides in pertinent part: "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considerations which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case. Such examination may include a brief statement of the facts of the case, to the extent the facts are appropriate and relevant to the issue of such examination, and shall be conducted individually and outside the presence of other persons about to be called as jurors or already called."

the venire seated in the courtroom the clerk read aloud both the statutory questions required by G. L. c. 234, § 28, and a group of questions submitted by counsel. The Commonwealth's questions related, inter alia, to the defendant's age, the fact that the crime involved several stab wounds, and the victim's homosexuality. The defendant's questions related, inter alia, to pretrial publicity and to the jurors' opinions about psychiatry and psychiatrists. When a juror raised his hand to indicate that he might be unable to consider the evidence fairly, the judge spoke to the juror at the side bar, apparently out of the hearing of the others. Three jurors responded to the questions, and all were excused.

"[General Laws, c. 234, § 28] is designed to impose a duty on the judge to examine jurors fully with respect to possible bias or prejudice if it appears that particular jurors or the jury pool as a whole may be influenced by extraneous factors to the extent that jurors would be unable to render an impartial verdict on the evidence presented to them and must, therefore, be excused for cause." *Commonwealth* v. *Dickerson*, 372 Mass. 783, 793 (1977). There must be some basis for finding a substantial risk that extraneous issues would influence the jury. *Commonwealth* v. *Campbell*, 378 Mass. 680, 696 (1979). "The judge has discretion in deciding whether that preliminary foundation has been laid." *Commonwealth* v. *Jones*, 9 Mass. App. Ct. 103, 115, S.C. 380 Mass. 939 (1980). The defendant may supply the judge with information constituting the foundation. Nevertheless, from the nature and posture of a case, the judge may be able to ascertain on his own whether there is a need for individual voir dire.[10]

In the present case, however, no sufficient foundation appears. Shelley argues that this case involves highly emotional issues fraught with possibilities that juror bias might remain hidden. He states that jurors would not be likely to

---

[10] The judge may, but need not, require the defendant to supply an affidavit furnishing the basis for determining whether individual voir dire is necessary.

express their biases about psychiatry or homosexual activity, nor would they speak freely about emotional reactions to evidence of a gruesome murder arising from homosexual activity. According to Shelley, these extraneous considerations required the judge to conduct individual voir dire.

In effect, Shelley argues that the mere presence of these issues always necessitates individual voir dire of all potential jurors. We cannot agree. First, "it appears to us a doubtful proposition that questions [concerning juror bias about psychiatrists] need be asked in every case involving testimony by psychiatrists and the defense of insanity." *Commonwealth* v. *Killelea,* 370 Mass. 638, 649-650 (1976). The present record contains nothing to make that proposition seem more plausible. Indeed, we question whether psychiatrists are a "class" within the meaning of G. L. c. 234, § 28.[11] Second, equally implausible is the proposition that individual voir dire of the venire is necessary in every case involving gruesome or shocking evidence. Finally, as to the role of possible juror bias about homosexuality, no avowed homosexuals testified in this case. Therefore, "preconceived opinions toward the credibility of" homosexuals would not have influenced the jury. We conclude that there was not a substantial risk that jurors would be influenced by extraneous issues. Therefore, G. L. c. 234, § 28, did not require the judge to conduct an individual voir dire.[12] Furthermore, refusing to do so was not an abuse of discretion.

[11] In *Commonwealth* v. *Campbell,* 378 Mass. 680 (1979), and *Commonwealth* v. *Jones,* 9 Mass. App. Ct. 103 (1980), *S. C.* 380 Mass. 939 (1980), the courts assumed without deciding that prison inmates and police officers, respectively, constitute "classes" under G. L. c. 234, § 28. We question that these groups, or psychiatrists, or members of other occupations, constitute "classes." A better construction of the term would include cultural, economic, or social groups. For example, homosexuals might constitute a class; or, in a case in which witnesses for one side were public assistance recipients, and those for the other side were government officials, poverty might define a class.

[12] Shelley attacks the judge's practice of collective questioning followed by questioning at the side bar of individual jurors who came forward. He contends that this is not equivalent to individual voir dire as required by G. L. c. 234, § 28. We agree. Collective questioning on sensitive issues

4. Shelley argues that the jury should have been allowed to consider whether mental illness deprived him of substantial capacity to premeditate Dubbels' murder and to appreciate the consequences of his extremely atrocious or cruel acts. We note that the judge appropriately charged the jury on the issue of premeditation as it may have been affected by intoxication.

Relying on *Commonwealth* v. *Gould*, 380 Mass. 672 (1980), decided after Shelley's trial, Shelley asks us to invoke our powers under G. L. c. 278, § 33E, and to order a new trial. Shelley also asks that we exercise our § 33E powers to reduce his conviction. In *Gould*, we held that the jury may consider a defendant's mental illness in determining the degree of murder, both on the question of premeditation and the matters of extreme atrocity or cruelty. When a case tried after the date of the *Gould* decision fairly raises the problem of the defendant's capacity to commit first degree murder under either theory, the defendant is entitled to appropriate instructions. If, as a result of a mental disease or defect, the defendant lacked substantial capacity to engage in deliberate premeditation before the killing, the jury may not convict him of first degree murder "committed with deliberately premeditated malice aforethought"; if, as a result of the mental disease, the defendant lacked substantial capacity to appreciate the nature of his extremely atrocious or cruel acts, or he lacked the capacity to stop committing such acts, the jury may not convict him of first degree murder "committed with . . . extreme atrocity or cruelty." G. L. c. 265, § 1.

We stated these views in the context of a review pursuant to our extraordinary powers. G. L. c. 278, § 33E. We ex-

may not elicit a response from some jurors who would respond in private. That the collective questioning provokes no "positive ripple among the venire," *Commonwealth* v. *Jones*, 9 Mass. App. Ct. at 115, does not conclude the issue whether individual voir dire is necessary. Nor is the issue settled when, as here, a few jurors come forward and are excused. Some more private form of questioning is necessary. Unless some evidence appears that other jurors can hear a side bar conference, that method of individual voir dire is generally acceptable. However, the preferable practice is questioning outside the presence of the jury.

ercise extraordinary powers only when necessary to reach a result that is consonant with justice. See, e.g., *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980); *Commonwealth* v. *Gould, supra* at 680. In light of the defendant's extensive psychiatric history, *Gould* involved especially egregious facts. Those facts warranted the exercise of our § 33E powers and the concomitant elaboration of new doctrine. However, the present case was tried before the date of the *Gould* decision. The defendant had no psychiatric history before he killed Dubbels. The record does not show that he sought a charge on the issues of deliberate premeditation and extreme atrocity or cruelty. He took no exception to the judge's failure to instruct the jury that they might consider the defendant's mental state on these issues. And a review of the facts does not otherwise persuade us to invoke our extraordinary powers as we did in *Gould*. Furthermore, we conclude generally that Robert Shelley is not entitled to relief under § 33E.

*Judgment affirmed.*