COMMONWEALTH *vs.* KENNETH M. PALLOTTA.

No. 93-P-486.

Middlesex. March 8, 1994. - June 15, 1994.

Present: DREBEN, KAPLAN, & KASS, JJ.

*Search and Seizure*, Warrant, Automobile on private property, Affidavit, Probable cause. *Controlled Substances. Constitutional Law*, Search and seizure. *Intent. Insanity. Witness*, Expert. *Evidence*, Expert opinion. *Psychotherapist.*

At the trial of an indictment for possession of cocaine with intent to distribute, the judge correctly denied the defendant's motion to suppress evidence seized pursuant to a warrant, where the police had complied with the "knock and announce" requirement and the search was within the scope of the warrant. [671]

Affidavits in support of a search warrant demonstrated the basis of knowledge of unnamed informants as well as their credibility or reliability, and provided probable cause for the issuance of the warrant. [671-672]

At a criminal trial the judge erred in excluding testimony of a qualified defense expert that the defendant suffered from a mental disease or defect that led to the defendant's lack of criminal responsibility on the date of the time of the acts alleged in the indictment, and a new trial was required. [673-676]

INDICTMENT found and returned in the Superior Court Department on December 19, 1989.

A pretrial motion to suppress evidence was heard by *Patrick J. King*, J.; a motion in limine to preclude expert opinion testimony was heard by *Robert H. Bohn*, J., and the case was tried before him.

*Bruce Ferg* for the defendant.

*Michael Adam Chinman*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Upon an indictment found in December, 1989, the defendant Kenneth M. Pallotta was tried in July, 1991, for his possession on October 7, 1989, of between 100 and

200 grams of cocaine with intent to distribute the same (G. L. c. 94C, § 32E[*b*][3]).[1] Proof on the part of the Commonwealth was made largely through the admission in evidence of the products of a search under warrant of the residence and person of Pallotta commencing about 6:00 P.M. on October 7. These materials were the usual to establish a going business in narcotics. In the targeted first-floor apartment at 48 Bradford Street, Everett, in a Corvette automobile registered to Pallotta and parked at the time in the driveway of the house, and on the person of Pallotta as he returned home about 6:20 P.M., State Trooper John R. Sprague, assisted by fellow troopers and Everett police officers, found the following in aggregate: over 155 grams of cocaine (some of a high grade), a beeper, an electronic scale, a triple-beam scale, a silver spoon with residue, two containers of Inositol powder (a substance to "cut" cocaine), four "cuff" sheets (characteristic records for narcotics distribution), five boxes of clear plastic bags (similar to those customarily used to package cocaine for distribution), a "kilo wrapper" (similar to packaging customarily used to wrap a kilogram of cocaine), with residue; packets of $1,030 and $926 in cash (found on the defendant's person, together with four plastic bags with 3 to 3.25 grams of cocaine each). Cross-examination of Commonwealth witnesses and testimony by defense witnesses were conspicuously feeble.[2] The jury in due course returned a verdict of guilty, and judgment of conviction followed.

On the present appeal, the defendant seeks to overthrow the conviction by attacking the judges' rulings on two motions made and decided before trial: (1) denial of the defendant's motion to suppress the cocaine and other things mentioned; (2) allowance of the Commonwealth's motion to exclude from trial the testimony of the defendant's psychiatrist. The defendant fails on the first point but succeeds on

---

[1]Pallotta was also indicted for conspiracy to violate the controlled substances act (G. L. c. 94C, § 40). This indictment was placed on file without change of plea.

Pallotta's wife was also indicted for trafficking; that charge was not involved in the present case.

[2]See note 8, *infra*.

the second, with the result that the judgment must be reversed for a new trial.

1a. The defendant's motion to suppress first attacked alleged irregularities in the execution of the warrant, and the judge conducted an evidentiary hearing on the matters raised. He found on sufficient proof that the officers had duly complied with the "knock and announce" requirement of the warrant when they undertook to enter the apartment. See *Commonwealth* v. *Gondola*, 28 Mass. App. Ct. 286, 287 (1990), cited by the judge. The defendant objected that the officers had exceeded the terms of the warrant when they entered two rooms on the second floor of the house and searched and found contraband there. The judge found correctly that these rooms were integral to, in a practical view part of, the first-floor apartment, citing *Commonwealth* v. *Scala*, 380 Mass. 500, 508-509 (1980); *Commonwealth* v. *Cohen*, 6 Mass. App. Ct. 653, 655 (1978), and so the protested search was authorized. Search of the Corvette was not expressly mentioned in the warrant, but as the judge wrote, citing *Commonwealth* v. *Signorine*, 404 Mass. 400, 403-405 (1989), a car, owned by the defendant-occupant of the residence, parked in the driveway, should be viewed as within the verge of the residence and thus covered by the warrant. The defendant has apparently abandoned the foregoing objections on the present appeal.

b. The defendant argues that the affidavit of Trooper Sprague dated October 7, 1989, submitted to a judge who signed the warrant on the same day, did not disclose probable cause. This affidavit incorporated and is to be read together with affidavits, also by Trooper Sprague, submitted to support warrants that were issued by judges on September 8 and September 15. The latter warrants were left unexecuted for tactical reasons — to exploit the best time for the search.

It cannot be questioned that "basis of knowledge" in the *Aguilar-Spinelli-Upton*[3] formula is amply shown. The unnamed, independent informants, code names "Blue" and

---

[3]*Aguilar* v. *Texas*, 378 U.S. 108 (1964); *Spinelli* v. *United States*, 393 U.S. 410 (1969); *Commonwealth* v. *Upton*, 394 U.S. 363 (1985).

"Black," showed by their accounts to Trooper Sprague that they were acquainted personally with the defendant Pallotta, had bought cocaine from him in direct dealings, knew the places of his operations (home, street locations nearby, and his open-air fruit and produce stand in Lynn), and, particularly in light of their own experiences in drug distribution, recognized him as a distributor.

On the issue of "credibility" or "reliability" under the governing formula, the informants, according to Trooper Sprague's affidavit, had assisted in numerous drug arrests and in the seizure of large quantities of cocaine. The defendant complains that these assertions in Sprague's affidavits are not much detailed. To be sure, we would be more confident if further detail had been provided, and Sprague may have been somewhat overcautious in withholding detail in order to prevent identification of the informants by those in the trade. Still, regarding the informant Blue, the affidavit points to his giving specific information about the current availability of cocaine, leading to the seizure of several ounces of cocaine from a named drug offender, one Scott Sanders of Somerville. The judge laid stress on the averment that Trooper Sprague arranged a controlled buy shortly before October 7, a purchase of cocaine by Blue from Pallotta; Sprague himself observed the buy. See *Commonwealth* v. *Warren*, 418 Mass. 86, 89-91 (1994); *Commonwealth* v. *Benlien*, 27 Mass. App. Ct. 834, 837-838 (1989). It is also a source of assurance about reliability that the informants, who were independent of each other, gave similar information; the convergence is a mark of the probable truth of their respective accounts. The information was not stale, as the criminal activity appeared ongoing. See Smith, Criminal Practice and Procedure § 195, at 139 n.6 (1983 & Supp. 1994). The judge was right to conclude that probable cause was shown.

c. Although it has no direct bearing on the sufficiency of the affidavits, we note that the judge conducted an in camera *Amral*-type[4] hearing at the defendant's request to deal with

---

[4]See *Commonwealth* v. *Amral*, 407 Mass. 511, 522-523 (1990), and note its relation to *Franks* v. *Delaware*, 438 U.S. 154 (1978).

the defendant's challenge to the truthfulness of some of the affiant's statements. The defendant had not established the grounds that would entitle him to such a hearing, but the judge, in his discretion, proceeded with it nevertheless; he directed the Commonwealth to produce documentation regarding the controlled buy and undertook to interrogate Sprague about the facts he had sworn to. After hearing, the judge concluded that the documentation furnished corroborated Sprague's account of the controlled buy. Further, Sprague identified three cases where, based on information supplied by Blue, indictments had been returned for drug trafficking. The judge corroborated Sprague's testimony by locating and examining the relevant court records.

2. In answer to the Commonwealth's threshold motion to exclude testimony at trial regarding the defendant's alleged lack of criminal responsibility, the defendant called his retained psychiatrist, Dr. David E. Rosengard, who testified on voir dire. Under questioning by the defendant's counsel, the witness described his education and professional experience, which duly qualified him as an expert. He testified that he had interviewed the defendant on two occasions in February, 1991, each for an hour and three-quarters, and at a third session, the morning of the voir dire, for one hour; in addition he had examined a discharge summary of the Mt. Pleasant Hospital dated July 26, 1986, written as the defendant ended a ten-day or three-week detoxification procedure there.[5]

A large young man, about six feet, six inches tall, weighing perhaps over 300 pounds, Pallotta gave an account of himself to the witness at the interviews of which we note the following. He was born in 1962. He was an average or mediocre student, but at high school he proved a superior football player. He received a year's football scholarship to a school at Bridgeton, Maine; then he enrolled at a college in Springfield. There he was introduced to the cocaine habit. His father was a dominating figure. After his school years he found himself in a kind of competition with his father to prove him-

---

[5]The discharge summary was not introduced in evidence, and only slight reference was made to its content.

self as a businessman, a competition in which he suffered some failures. In 1986 (aged twenty-four) he had the detoxification experience mentioned. Later he formed a relationship with a young woman who to his chagrin was disfavored by his father and mother, but he married her, and the marriage appeared good. At the time of the last interview they had had a child.

To reduce the substance of Dr. Rosengard's professional observations to barebones:[6] He said the defendant, aged twenty-seven at the time of the offense, has been repeatedly an abuser of cocaine. The defendant suffered from (i) "organic impairment of some sort of physiology in the brain" (referring to convulsions during the defendant's high school days); (ii) "chronic and recurrent acute major depression" "of long standing" (believed to be "genetically predetermined"); (iii) "compulsive/impulsive personality disorder" (leading to irresistible resort to cocaine). In the witness's view, the three conditions listed comprised a mental disease or defect. This was exacerbated by the defendant's overuse of cocaine. In consequence of the mental illness, the defendant at the date of the indictment lacked criminal responsibility — in the terms of *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967), "lack[ed] substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." Stated more particularly, the witness's position was that it was not the drug abuse that caused the mental disease or defect (or the lack of responsibility). Rather, quite apart from the drug consumption, there was a direct causal relationship between the defendant's mental disease or defect and his lack of criminal responsibility. It will be seen that the witness's position here conformed to the decisions dealing with the critical questions of causation. See *Commonwealth* v. *Sheehan*, 376 Mass. 765, 767-772 (1978); *Commonwealth* v. *Shelley*, 381 Mass. 340, 349-351 (1980); *Commonwealth* v. *Brennan*, 399

---

[6]We sum up the effect of the witness's views without tracking in detail questions and answers, objections, and offers of proof.

Mass. 358, 361-362 (1987); *Commonwealth* v. *Angelone*, 413 Mass. 82, 84-85 (1992).

The Commonwealth noted objections at a few points to Dr. Rosengard's testimony, but it did not cross-examine him, nor did it introduce any countervailing proof. (In fact, it had in hand an evaluation of the defendant by Dr. Martin J. Kelley, associate director of the division of psychiatry of Brigham and Women's Hospital, which cleared the defendant of any mental disease or defect under *McHoul*.)

The defendant argues, correctly, that on the record as made, the judge was not justified in holding the psychiatrist's testimony inadmissible at trial. (The question of its weight, were it admitted at trial, is of course a quite different matter.) Suggesting that what afflicted the defendant was little more than a personality or character disorder, the judge ruled that mental disease or defect in the sense of *McHoul* was not indicated. This lacked support in the one-sided record. If mental disease or defect was indicated, then, said the judge, it was caused by the voluntary consumption of drugs, and so did not count in the *McHoul* assessment. The record was exactly to the contrary as to the role of drugs in the case, and the judge could not claim superior expertness. As to the witness's opinion that there was direct connection between the mental disease or defect and the lack of criminal responsibility, the drug overuse being exacerbation, not a cause, the judge said of the witness: "He's [not] qualified[7] to give that opinion," "that calls for an opinion for the court to make, not . . . the witness." The judge perhaps reasoned that, as he had to rule on the admissibility of the expert's testimony, it was for him to draw such conclusions, and the expert's conclusory opinion would be disregarded. This, however, would subvert the function of expert testimony as a help to nonexperts, including the judge.

Cases can arise where an expert's opinion is transparently so wrong or misdirected that a judge, although a nonexpert,

---

[7]As noted above, the witness was qualified as an expert by education, training, and experience. The judge of course was using "qualified" in another sense.

can properly deny admission of the testimony even in the absence of conflicting testimony. On the state of the present record, this is not such a case. We point out, however, that all we decide is that on the record the question of criminal responsibility should have been left to a jury, not peremptorily disposed of by the judge. The Commonwealth will have its chance at the next stage. The jury at a well-ordered new trial may find it hard to accept that a defendant who engaged over a period of time in surreptitiously planning and carrying out many transactions in the distribution of drugs was a hapless soul unable to recognize that he was doing something illicit or psychologically unable to bring himself to stop it.[8]

> *Judgment reversed.*
> *Verdict set aside.*

---

[8]At the trial of this case, the psychiatrist did appear as a witness and testified, in apparent support of the proposition that Pallotta was so addicted at the time charged that he could not form the intent intrinsic to the crime. It is fair to say that the witness was shaken on cross-examination. The jury convicted.