COMMONWEALTH VS. OSCAR URREA.

Suffolk. December 9, 2004. - February 28, 2005.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Insanity. Mental Impairment. Homicide. Evidence,* Relevancy and materiality, Cumulative evidence, Photograph. *Practice, Criminal,* Instructions to jury, Assistance of counsel, Argument by prosecutor, Capital case. *Constitutional Law,* Assistance of counsel. *Intoxication.*

At a murder trial where the defendant sought to present a mental impairment defense (specifically, to demonstrate that a combination of alcohol intoxication and mental illness caused him to lack the mental capacity to form the intent necessary deliberately to premeditate or to be sufficiently aware of his actions to warrant a conviction of murder in the first degree on the theory of extreme atrocity or cruelty), it was not prejudicial error for the prosecutor to elicit testimony from a defense expert witness that the defendant could appreciate the difference between right and wrong, where the question was relevant to whether the defendant's mental impairment prevented premeditation or mitigated the atrocity or cruelty of the murder; where the question did not divert the jury's proper focus from the ultimate issue (i.e., whether the Commonwealth had proved that the defendant had the required mental state); and where such a question was not contrary to this court's holding in *Commonwealth* v. *McHoul*, 352 Mass. 544 (1967). [534-539]

No substantial likelihood of a miscarriage of justice arose at a murder trial from the defense attorney's concession in closing argument that the defendant's attack on the victim, which had resulted in twenty-three stab wounds, was "disproportionate" and "excessive," where such a concession was demanded by the facts of the case, and where the defense attorney argued that the very disproportion and excessive nature of the killing demonstrated the defendant's mental impairment with respect to the defendant's capacity both to premeditate a defense and to appreciate the brutality of his acts. [539-543]

At a murder trial, the judge did not abuse his discretion in excluding certain documentary material concerning the defendant's family's mental health history that was merely cumulative of evidence already admitted [543-545]; further, the judge did not abuse his discretion by admitting in evidence a certain autopsy photograph of the victim, where the photograph was not duplicative, was clearly relevant to the issue of extreme atrocity or cruelty, and was not unduly inflammatory [545-546].

A criminal defendant failed to demonstrate that a statement in the prosecutor's closing argument relating to the defendant's tolerance for alcohol misstated the facts or improperly injected the prosecutor's personal opinion. [546-547]

No reason appeared on the record of a murder trial for this court to exercise its power under G. L. c. 278, § 33E, either to reduce the verdict or order a new trial. [547]

INDICTMENTS found and returned in the Superior Court Department on May 31, 2000.

The cases were tried before *Robert A. Mulligan*, J.

*Chauncey B. Wood* for the defendant.

*Paul B. Linn*, Assistant District Attorney, for the Commonwealth.

COWIN, J. A jury convicted the defendant of murder in the first degree on the theory of extreme atrocity or cruelty.[1] The victim was his girl friend, Jolanda Diaz. The defendant also was convicted of assault by means of a dangerous weapon on a second victim, Solaine DeJesus. At trial, the defendant did not raise an insanity defense, i.e., a claim of lack of criminal responsibility. Rather, he conceded his guilt of murder, contesting solely whether he was guilty of murder in the first degree or murder in the second degree. He sought a verdict of murder in the second degree on the ground that a combination of alcohol intoxication and mental illness caused him to lack the mental capacity (a) to form the intent necessary deliberately to premeditate or (b) to be sufficiently aware of his actions to warrant a conviction of murder in the first degree on the theory of extreme atrocity or cruelty.[2] He claims on appeal that it was prejudicial error for the prosecutor to elicit testimony that he could appreciate the difference between right and wrong when he had not raised an insanity defense. He further contends that he was denied the effective assistance of counsel by his attorney's concession in closing argument that his attack on the victim had been "disproportionate" and "excessive." This concession, he argues, deprived him of a defense to murder in the first degree on the theory of extreme atrocity or cruelty. He also argues error from the following: the exclusion of certain

---

[1]The jury did not find the defendant guilty of murder in the first degree on the theory of deliberate premeditation. The Commonwealth did not proceed on a theory of felony-murder.

[2]This doctrine was adopted in *Commonwealth* v. *Gould*, 380 Mass. 672, 680-686 (1980).

documentary material concerning familial mental health history; the admission of a certain autopsy photograph of the victim; and the prosecutor's closing argument misstating the evidence relating to the defendant's tolerance for alcohol. Finally, the defendant requests that we exercise our extraordinary power pursuant to G. L. c. 278, § 33E, to reduce the convictions to murder in the second degree. We affirm the convictions and decline to grant relief under G. L. c. 278, § 33E.

The facts surrounding the death of the victim are not in dispute. The defendant murdered Jolanda Diaz, his former girl friend, by stabbing her twenty-three times in the kitchen of her home on the evening of April 2, 2000. The defendant was moved to kill her because, although they had previously been close, her feelings for him had cooled, and, on the day in question, she rejected his invitation to go out. The victim lived on the second floor of a three-family home with an extended family that included her father and mother; a younger brother, Emilio Diaz; his girl friend, Solaine DeJesus (the victim of the assault by a dangerous weapon charge); and their infant son. An uncle and his girl friend lived on the third floor. On the day of the murder, the defendant visited the victim at home and asked her to go out with him. She refused and, at some point later, he left the apartment, and spent time drinking with a friend.

The defendant returned to the victim's home in the evening and watched television in the living room with the victim's father and her brother. Neither one noticed anything unusual about the defendant. The defendant and the victim's father discussed sports and the defendant did not appear to have been drinking. The victim was in the kitchen cooking. At about 10 P.M., the defendant spoke with DeJesus and told her to take good care of her baby and not to let him do bad things. She noticed nothing abnormal about the defendant and viewed his words as advice. At about 10:15 P.M., the defendant reminded the victim's father that it was time for his weekly Sunday night drive to pick up his wife at a nearby subway station. The father left for the station shortly thereafter.

At about 10:30 P.M., the victim's brother and her uncle and his girl friend (all of whom were in the third-floor apartment) heard a loud bump against the back door. The victim cried,

"Oscar killed me." When they opened the door, the victim, covered with blood, fell into the apartment. Someone dialed 911; the victim was taken by ambulance to a hospital and died while in surgery as a result of the stab wounds.

After he stabbed the victim, the defendant entered the bedroom occupied by DeJesus and the baby. The defendant said to DeJesus, "I should kill you too, as well, because you also lied to me." His hands were bloody and he was holding the knife at shoulder level. The woman pleaded with him to spare her for her son's sake. The defendant looked at the baby and left the room. The defendant was next seen outside the house by the victim's brother. The defendant was on a nearby corner, holding a large knife. He looked "a little desperate," as if "he didn't have anywhere to go" and "didn't care about anything." He began to slash at his neck with the knife. When he saw the victim's brother, he said, "Your sister failed me. That's why I killed her." He also stated that he had killed her because she did not love him and that she would not belong to anyone if not to him. He then lifted his shirt and started stabbing himself in the stomach. His speech was normal and comprehensible and he was able to walk backwards without stumbling. The police arrived and demanded that he drop his knife. The defendant stabbed himself again in the stomach and threatened to kill himself. The officers ultimately subdued the defendant by repeatedly spraying him with mace. The defendant was treated at a hospital for several knife wounds, including some that were "quite deep." The treating surgeon concluded that none of the wounds was life threatening and saw no need for an immediate "psychiatric or mental health consult." The defendant's blood alcohol level at 11:10 P.M. was .167. Three days later, a licensed forensic psychologist interviewed the defendant in jail, found him "tearful" at one point, but otherwise "fairly composed," giving "logical and rational" answers to her questions and she concluded that he "presented no immediate psychiatric distress."

The defense was based on a sympathetic portrayal of the defendant's background and expert testimony concerning his mental condition and his alcoholic state at the time of the murder. The defendant was raised in a very poor and violent

section of Medellin, Colombia, with an abusive, alcoholic father. Several of his relatives had been hospitalized for mental illnesses, including three brothers, his paternal grandmother, two maternal aunts, and four cousins. Two sisters and his mother had taken medication for mental illnesses. Dr. Mervyn Perrine, a psychologist, testified that the defendant's blood alcohol level was very high at the time of the murder and would have impaired significantly the defendant's perceptions, planning and judgment. Dr. Eric Brown, a clinical forensic psychologist, testified that he interviewed the defendant and administered several psychological diagnostic tests. Dr. Brown also reviewed the defendant's medical records as well as those of his brothers who had been hospitalized for major mental illnesses and other relevant material concerning the defendant. Dr. Brown related that the defendant had informed him that he had been sexually molested and raped as a child, had a lengthy history of alcohol abuse, and that he had been hospitalized in 1995 for suicidal ideation. The defendant also told Dr. Brown that he was profoundly depressed on the morning of the murder (due to his "sense" that Jolanda was "falling out of love with him"), and that he went to a friend's house and drank several shots of vodka-like liquor when Jolanda refused his request to go out. He planned then to kill himself, and said that he "snapped" when Jolanda ended their relationship. Dr. Brown opined at trial that the defendant suffered from posttraumatic stress disorder, a mixed personality disorder, and a major depressive disorder. Jolanda's rejection of him caused him to "dissociate[]," lose "complete control of himself," and become "unaware of thoughts." It made him incapable of evaluating his actions or appreciating the nature and consequences of his behavior. Dr. Russell Vasile, a psychiatrist, testified that he interviewed the defendant and performed a brain wave test on him. He also reviewed the defendant's family history and other data. Based on this work, Dr. Vasile's opinion was that the defendant experienced an acute dissociative state triggered by the victim's final rejection of him.

1. *Question about the difference between right and wrong.* The defendant claims that it was error to permit the prosecutor to ask Dr. Brown, the defense psychologist, whether the

defendant could "appreciate the difference between right and wrong" at the time of the murder. To address this issue, it is useful to illuminate the difference between the criminal responsibility test we adopted in *Commonwealth* v. *McHoul,* 352 Mass. 544, 548-555 (1967), and the mental impairment doctrine set forth in *Commonwealth* v. *Gould,* 380 Mass. 672, 680-683 (1980). In *Commonwealth* v. *McHoul, supra* at 546-547, as an "evolutionary restatement" of our "modification" of the *M'Naghten* rule, see *M'Naghten's Case,* 8 Eng. Rep. 718 (1843), we adopted the Model Penal Code test for determining criminal responsibility. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul, supra.* See *infra.* On the other hand, the mental impairment defense allows a defendant to argue that an abnormal mental condition negates his capacity to form a specific intent or his ability to make a decision in a normal manner. When the defense is one of impairment of mental processes, the issue is whether, as a result of a mental disease or defect, the defendant lacked substantial mental capacity to engage in deliberate premeditation, *Commonwealth* v. *Gould, supra* at 682. See *Commonwealth* v. *Shelley,* 381 Mass. 340, 354 (1980). As to extreme atrocity or cruelty, the inquiry is whether, as a result of mental illness, the defendant's ability to "make a decision in a normal manner" was impaired and, if so, whether this impairment affected his "ability to appreciate the consequences of his choices," *Commonwealth* v. *Gould, supra* at 686 & n.16, i.e., whether he "lacked substantial capacity to appreciate the nature of his extremely atrocious or cruel acts, or . . . lacked the capacity to stop committing such acts." *Commonwealth* v. *Shelley, supra* at 354.

With this distinction in mind, we turn to the events at trial. In pursuit of his strategy not to present an insanity (lack of criminal responsibility) defense, but merely to persuade the jury that the defendant lacked sufficient mental capacity to warrant a finding of murder in the first degree, the defendant filed a motion in limine to preclude the admission of any testimony regarding

criminal responsibility. The judge did not rule on the motion until the conclusion of the direct examination of Dr. Brown (during the defense case). At that time, the judge ruled that the prosecutor could not ask "the *McHoul* definition, per se," but could ask a question to clarify "that [Dr. Brown] is not claiming that the defendant is not criminally responsible." Over objection, the prosecutor was permitted to inquire whether the defendant appreciated the difference between right and wrong at the time of the murder. The answer was that the doctor believed that the "defendant could appreciate the difference between right and wrong." Defense counsel immediately moved for a mistrial, which was denied. There was no error.

The question is relevant to whether the defendant's mental impairment prevented premeditation; the inquiry probes his capacity to evaluate his acts. *Commonwealth* v. *Gould, supra* at 683. The question is also helpful in determining whether the defendant's mental impairment mitigated the atrocity or cruelty of the murder; it aids in determining the "defendant's ability to make a decision in a normal manner," *id.* at 686, and "what effect, if any, [his] impaired capacity had on his ability to appreciate the consequences of his choices," *id.* at 686 n.16. The right versus wrong inquiry is probative because it is relevant to a determination whether a person is mentally impaired and can appreciate that his behavior would result in a victim's death. Because the rule is described as focusing on the lack of substantial capacity to appreciate the nature of one's acts, see *Commonwealth* v. *Shelley, supra* at 354, it would be illogical to deny a right versus wrong inquiry as an aid in determining the ultimate answer.

Nor did the prosecutor's single question divert the jury's proper focus from the ultimate issue: whether the Commonwealth had proved that the defendant had the required mental state. The right versus wrong equation was not mentioned by the prosecutor in closing or by the judge in his instructions. And the jury were instructed by the judge on the pertinent law. The judge devoted two pages of instructions to educating the jury on the relation of the defendant's intent to the elements of murder in the first degree.

Notwithstanding the logical relevance of such a question, the

defendant claims that the question was forbidden by the *Mc-Houl* case, because there we expressed a hope that the new test would end the debates on the issue whether the defendant knew right from wrong. *Commonwealth* v. *McHoul, supra* at 554. In further support of his argument, the defendant also cites a footnote in that case, see *id.* at 554 n.10, to assert that such an inquiry into a defendant's "knowledge of the difference between right and wrong, standing alone, is 'meaningless.' " He contends that, because the *McHoul* decision indicates that such an inquiry would not be relevant to the defendant's criminal responsibility, the question therefore could not have any relevance to the more "attenuated issues" in the present case: whether the defendant had the mental capacity necessary for murder in the first degree under theories of deliberate premeditation or extreme atrocity or cruelty. This argument fails because it is based on the faulty premise that *McHoul* forbids inquiry into right versus wrong in criminal responsibility cases.

Reading the *McHoul* case as a whole makes it clear that the court did not intend to create a rule of evidence barring inquiry into a defendant's capacity to distinguish right from wrong. The text of the case expresses the hope that the adoption of the new definition for lack of criminal responsibility would eliminate artificial constraints on experts' testimony, and "end . . . the confusing debates on the issue: 'Does he know right from wrong?' and related topics." *Commonwealth* v. *McHoul, supra* at 554.

In the footnote in the *McHoul* case cited by the defendant, we quoted *United States* v. *Currens,* 290 F.2d 751, 772 (3d Cir. 1961), that a mental health expert "should not be asked . . . 'Did the defendant . . . know the difference between right and wrong?'. . . Such questions . . . are so vague as to be meaningless." That footnote, however, appears only in the context of a discussion of our decision to abandon the *M'Naghten* rule,[3] see *M'Naghten's Case,* 8 Eng. Rep. 718 (1843), and in the hope that the newly adopted test would reduce

---

[3] The *M'Naghten* rule, as modified by this court, has been stated as follows: "One whose mental condition is such that he cannot distinguish between right and wrong is not responsible for his conduct, and neither is one who has the capacity to discriminate between right and wrong but whose mind is in such a

the semantic dueling between attorneys and experts. *Commonwealth* v. *McHoul, supra* at 554.[4] It did not prohibit such questions.

Our cases following the *McHoul* decision have made clear that the *McHoul* case was not intended to prevent all inquiry into right versus wrong. In *Commonwealth* v. *Marshall*, 373 Mass. 65, 70 (1977), a case with facts similar to those at bar (although the defense was lack of criminal responsibility and not mental impairment), a defense expert testified that, "in his opinion, at the time of the crimes the defendant was suffering from a mental disease . . . and . . . was so mentally ill with depression and overwhelmed by seeing his former girl friend and former business partner together that he lacked the capacity to conform his conduct to the requirements of law, and was unable to know right from wrong." We stated that "the expert was questioned as to his opinion in accordance with the principles of *Commonwealth* v. *McHoul, supra.*" *Id.* See *Commonwealth* v. *Ruddock*, 428 Mass. 288, 291 (1998) (again a case involving lack of criminal responsibility) we stated: "The law relieves a person with a mental disease or defect of the consequences of his unlawful conduct if, because of the mental disease or defect, that person is unable to know right from wrong or is unable to control his unlawful conduct. See . . . *Commonwealth* v. *McHoul, supra* at 546-547." The *McHoul* case did not intend that questions about right versus wrong be prohibited in criminal responsibility cases, and it follows that there is no requirement that they be excluded when mental impairment is the issue.

The defendant also argues that the impact of the alleged error in permitting the prosecutor's question was aggravated by the judge's response to a jury question set forth below. Although we have determined that the prosecutor's question was not

diseased condition that his reason, conscience and judgment are overwhelmed by the disease and render him incapable of resisting and controlling an impulse which leads to the commission of a homicide. . . ." *Commonwealth* v. *McCann*, 325 Mass. 510, 515 (1950).

[4]The defendant refers to the Model Penal Code's comment that "the actor's appreciation of the wrongfulness of his conduct is a largely detached or abstract awareness that does not penetrate to the affective level." Model Penal Code and Commentaries § 4.01, comment 2, at 166 (1985). This statement, too, was made in the context of a discussion of the "shortcoming[s]" of the *M'Naghten* rule.

improper, consistent with our obligation pursuant to G. L. c. 278, § 33E, we consider the answer to the jury question to determine whether the judge's answer created a substantial likelihood of a miscarriage of justice.[5] During deliberations, the jury sent the judge a note asking the following question (among others): "Is there a plea of not guilty by reason of insanity, and is this different from the charges we are disputing?" The judge proposed answering the question as follows: "The short answer is, 'yes, we're not dealing with that in this case.' " The attorneys agreed with this formulation (the defense attorney stated: "I agree that the answer is there is no insanity defense in this case, yes"). The judge answered the question: "[T]his is not a case in which there is a plea of not guilty by reason of insanity. That verdict option is not being given to you." There was no objection to this instruction.

The scope of supplemental jury instructions is within the judge's sound discretion. *Commonwealth* v. *Stokes*, 440 Mass. 741, 750 (2004), and cases cited. The judge had previously informed the jury that any evidence of the defendant's mental impairment or intoxication could be considered in deciding whether he had acted with the intent and knowledge required by the charges and whether he acted with extreme atrocity or cruelty. Following such an instruction, the judge acted well within his discretion in limiting his answer to the fact that there was no insanity defense before the jury. Moreover, given the terms of the question, the judge's response was accurate. The wording of the question indicated that the jury distinguished the defense of insanity from the defense in the present case.[6]

2. *Defense counsel's concession that the attack on the victim was "disproportionate" and "excessive."* The defendant main-

---

[5]Because there was no objection to the judge's response to the jury question (indeed, trial counsel stated that he agreed with the judge's proposed answer, see *infra*), we review to determine whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Brum*, 441 Mass. 199, 205 (2004).

[6]We do not agree with the Commonwealth's statement in its brief that it is "far more likely that the jurors simply mistook the entire defense of mental impairment" for the more commonly known defense of "insanity."

tains that trial counsel was ineffective[7] for failing to argue in his closing that the defendant was not guilty of murder in the first degree on the theory of extreme atrocity or cruelty. Because he has been convicted of murder in the first degree, we consider his claim of ineffectiveness of counsel to determine whether there exists a substantial likelihood of a miscarriage of justice, as required under G. L. c. 278, § 33E, which is more favorable to a defendant than the constitutional standard for determining the ineffectiveness of counsel. *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Thus, we consider whether there was error during the course of the trial, and, if so, whether the error was "likely to have influenced the jury's conclusion." *Id.* Under this more favorable standard of review, we consider a defendant's claim even if the action by trial counsel does not "constitute conduct falling 'measurably below' that of an 'ordinary fallible lawyer.' " *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 517 (1992), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). There was no error.

The defendant maintains that trial counsel conceded that the attack on the victim was "disproportionate" and "excessive," thereby admitting the defendant's guilt on the theory of extreme atrocity or cruelty. Defense counsel stated that twenty-three stab wounds were "completely disproportionate" and "excessive by any measure." This was a concession demanded by the facts of the case. Counsel made an unavoidable admission and argued the only viable defense:

> "You . . . weigh the evidence [and] the testimony with respect to this man's mental condition. I am making a limited point to you and, that is, whatever this man was on April [second], he was not normal. His thought process was not comparable to yours or mine. He could not form a plan, weigh the pros and cons of that plan, carry out a premeditated crime, *understand during the course of this savage event what he was doing or the extent of harm he was inflicting.* . . . I ask of you . . . fair consideration of this evidence and, in particular, this man's mental condition." (Emphasis supplied.)

---

[7]The defendant is represented by new counsel on appeal.

Accordingly, contrary to the defendant's contention, the concession of disproportionate force was not a concession of the defendant's guilt on the theory of extreme atrocity or cruelty.[8]

Defense counsel made the very disproportion and excessive nature of the killing a part of the evidence of impairment. He used the excessiveness of the acts together with the defendant's family history and the expert psychological and psychiatric testimony to demonstrate the defendant's mental impairment. Counsel argued the only position available: no matter the disproportion of the force, this defendant could not understand the "extent of harm he was inflicting."

The defendant also asserts that the single statement in the closing argument (that the defendant could not "understand during the course of this savage event what he was doing or the extent of harm he was inflicting") was insufficient to explain to and convince the jury that the defendant lacked the mental capacity to appreciate the brutality of his act. The defendant claims that, although counsel argued sufficiently the defense of mental impairment and alcohol intoxication as it affected premeditation, he did not argue sufficiently that the defendant lacked the mental capacity necessary for extreme atrocity or cruelty.

We have read closely the argument of defense counsel. It is a well-conceived and well-articulated statement premised on the contention that the defendant's mental condition and intoxication both deprived him of the capacity to premeditate and mitigated the atrocity of the murder. True, the defense attorney never used the term "extreme atrocity or cruelty" in the closing. But he argued that the defendant was incapable of appreciating the "extent of harm he was inflicting," thereby explaining the relevance of the defendant's mental illness to the disproportionate use of force.

The defendant is correct that trial counsel's closing emphasized the deliberate premeditation issue. Trial counsel did argue

[8]This case is thus distinguishable from *Commonwealth* v. *Street,* 388 Mass. 281 (1983), and *Commonwealth* v. *Westmoreland,* 388 Mass. 269 (1983). There, we reversed convictions due to counsels' concession in closing argument that there was not enough evidence to conclude that those defendants lacked criminal responsibility, despite the fact that there was sufficient evidence with respect to that defense.

repeatedly the defendant's inability to premeditate. But he also presented an organized argument bearing on the extreme atrocity or cruelty issue. Counsel both began and ended his closing argument by referring to the theme that the defendant could not understand the extent of what he was doing and the obvious grievous bodily harm and death that would occur. The central portion of the argument detailed the evidence concerning the defendant's inability to plan, his unfortunate childhood and mental health issues, and the effect of the breakup that prevented his understanding what he was doing. The fact that counsel chose to emphasize the lack of premeditation rather than the absence of the factors that constitute extreme atrocity or cruelty does not render his argument lacking. The defendant has drawn our attention to no case in which we have found ineffectiveness for emphasizing one argument more than another.

Any doubt that may have been in the jury's minds regarding the connection between mental impairment and extreme atrocity or cruelty was eradicated by the judge's instructions that plainly related mental impairment to both deliberate premeditation and extreme atrocity or cruelty. The judge instructed: "Evidence of the defendant's intoxication, evidence of the defendant's mental impairment . . . is relevant on the issue of extreme atrocity or cruelty. It is relevant on the issue of intent. It is relevant on the issue of the defendant's knowledge. So you must consider the evidence of mental impairment [and] the effect of consumption of alcohol . . . . It also bears upon the issue of extreme atrocity or cruelty because the Commonwealth must prove in that instance one of those factors [previously enumerated] . . . that the defendant took pleasure or was indifferent to the injury he's caused, his knowledge of the situation that was occurring. So whenever the defendant's intent, his ability to deliberately premeditate, and/or the issue of extreme atrocity or cruelty is an issue, you must consider the test of mental impairment."[9] This

---

[9]The complete text of the judge's instruction on this point is as follows:

"In this particular case, there was evidence about intoxication. There was evidence about mental impairment. I instruct you the Commonwealth must prove malice, must prove deliberate premeditation, and must prove extreme atrocity or cruelty. It must prove those ele-

instruction came immediately after the judge's definition of the elements of murder in the first and second degrees. The instruction substantially comports with that contained in the Model Jury Instructions on Homicide at 61-62 (1999).

The judge also instructed the jury that, even if defense counsel had conceded anything in closing argument, it was still the province of the jury to decide whether the elements of murder in the first degree or murder in the second degree had been proved. The defendant claims that these comments by the judge "conveyed the unmistakable message that defense counsel had conceded his client's guilt of this crime." As we have stated, the concession by counsel was only as to the disproportionate use of force. He did not concede that the defendant understood the extent of the harm he was inflicting.[10]

---

ments beyond a reasonable doubt and the applicable theories. Evidence of the defendant's intoxication, evidence of the defendant's mental impairment shall be considered by you in determining whether the Commonwealth has proven the elements of the charges beyond a reasonable doubt. That type of evidence is relevant in your determination of deliberate premeditation. It is relevant on the issue of extreme atrocity or cruelty. It is relevant on the issue of intent. It is relevant on the issue of the defendant's knowledge.

"So you must consider the evidence of mental impairment. You must consider the evidence of the effect of consumption of alcohol on those issues that I have just outlined for you. Bear in mind the Commonwealth must prove the defendant was capable of deliberate premeditation. The Commonwealth must prove the defendant was capable of forming the intent required under the [issue of] malice. It also bears upon the issue of extreme atrocity or cruelty because the Commonwealth must prove in that instance one of those factors, some of those factors, involve the defendant's knowledge, that the defendant took pleasure or was indifferent to the injury he's caused, his knowledge of the situation that was occurring. So whenever the defendant's intent, his ability to deliberately premeditate, and/or the issue of extreme atrocity or cruelty is an issue, you must consider the test of mental impairment. You must consider the evidence relative to intoxication, because the Commonwealth must prove the capacity and the ability to form the intent required. To deliberately premeditate may also bear, as I say, on the issue of extreme atrocity or cruelty."

[10]The defendant suggests that he was not convicted on the deliberate premeditation theory because the jury "most likely" found that he was mentally impaired. The intimation of this argument is that, because of defense counsel's lack of emphasis on extreme atrocity or cruelty in the closing, the

3. *Exclusion of documentary material concerning familial mental health history.* The defendant sought to introduce the mental health records of two of his brothers and a chart identifying those members of his family who had been treated for mental illness. The defendant complains that the judge's refusal to admit this evidence deprived him of his constitutional and statutory right to present a defense and that such evidence would have corroborated the testimony regarding the defendant's family's mental health history. A trial judge has discretion to exclude evidence that would be merely cumulative of evidence already admitted. *Commonwealth* v. *Durning,* 406 Mass. 485, 497 (1990). The defendant's mother testified that eleven of the defendant's close relatives, including three brothers, had been hospitalized for mental illnesses. Dr. Brown confirmed that at least two brothers had been hospitalized for mental illnesses and stated that a family history of mental illness "is significant . . . because it adds weight to the argument that there is some mental illness or mental disorder in [the defendant]." Dr. Vasile stated that the defendant had relatives "on both sides . . . hospitalized for mental illness," and that a high incidence of family mental illness supported his belief that the defendant's mental disorder has a "biological basis." The excluded records thus would have been merely cumulative of this testimony. Moreover, they consisted of an estimated "5,000 documents" and had only recently been disclosed to the prosecution. In such circumstances, the judge did not abuse his discretion in excluding them.

Nor was there prejudice to the defendant from the judge's decision. The Commonwealth did not dispute that the two brothers suffered serious mental illnesses. The prosecutor used this fact in cross-examination of one of the experts, choosing to elicit testimony that despite family histories of mental illness, some members are not affected, and then arguing that eyewit-

jury must have misunderstood the impact of mental impairment on extreme atrocity or cruelty. This argument is without merit. The jury could have found, for example, that the defendant was not mentally impaired, but that the facts did not support an inference of deliberate premeditation. Alternatively, they could have found that he was impaired, but the impairment only affected his capacity to premeditate. See *Commonwealth* v. *James,* 427 Mass. 312, 316 n.3 (1998).

ness testimony concerning the defendant's behavior at the time of the murder indicated that he was not mentally impaired.

4. *Admission of autopsy photograph.* The defendant posits that one autopsy photograph should not have been admitted because it was highly prejudicial and cumulative. The defendant objected to the introduction of this photograph because it depicted suturing across the victim's breast as a result of the autopsy, and showed her intubated. He also objected as the picture was cumulative of ten other autopsy photographs the Commonwealth planned to introduce. "The admissibility of photographic evidence is left to the discretion of the trial judge, and we will overturn the judge's decision only where a defendant is able to bear the heavy burden of demonstrating an abuse of that discretion." *Commonwealth* v. *Waters*, 399 Mass. 708, 715 (1987). See *Commonwealth* v. *Vizcarrondo*, 431 Mass. 360, 362-363 (2000). "[I]f the photographs possess evidential value on a material matter, they 'are not rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury.' " *Commonwealth* v. *Benson*, 419 Mass. 114, 118 (1994), quoting *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990). Here, as the judge found, each of the eleven autopsy photographs depicted at least one wound that did not appear in any of the others. In addition, as trial counsel conceded, the one disputed photograph was clearly relevant to the issue of extreme atrocity or cruelty. The photograph is not unduly inflammatory: the scar across the victim's chest is clearly a surgical one, neatly sutured, and the intubation tube is likewise clinical. Only the lower half of the victim's face can be seen, and it is not gruesome. The exposure of breasts is not unusual in an autopsy photograph. There was no abuse of discretion. See *Commonwealth* v. *Boateng*, 438 Mass. 498, 507 (2003) (admission of one postautopsy photograph showing victim with scalp removed not abuse of discretion). See also *Commonwealth* v. *Robinson*, 14 Mass. App. Ct. 591, 596 (1982) (no error in admitting photographs of victim that displayed "surgical incisions, along with the stab wounds, as well as tubes which had been inserted into the victim's throat"). Moreover, the judge instructed the jury when the photographs were admitted, and again during his final

instruction, they were to decide the case unemotionally, dispassionately, and analytically. See *Commonwealth* v. *Allison*, 434 Mass. 670, 684 n.11 (2001).

5. *Closing argument concerning the defendant's tolerance for alcohol.* The defendant claims that the prosecutor misstated the evidence and injected her personal opinion by stating that the defendant's mental capacity was not affected by his intoxication because "he had a high tolerance for alcohol." The background for this claim is as follows. Dr. Perrine, a psychologist called by the defense, testified that the defendant's blood alcohol level was .167 at 11:10 P.M., a level that would have impaired his visual perception, information processing and judgment. The doctor explained that he was aware of the defendant's "heavy" use of alcohol and that alcohol affects the perception and judgment of one who drinks heavily to the same degree that it affects those faculties in those who drink less. He also stated that, because a heavy drinker eliminates alcohol more rapidly than one who normally drinks less, the defendant's blood alcohol level would have been even higher earlier in the evening, and thus his mental impairment would have been even more severe. This testimony was important to the defense to establish that the defendant's intoxication, in conjunction with his mental illness, prevented him from having the mental capacity to commit murder in the first degree.

The allegedly improper statement was contained within the following section of the prosecutor's closing:

> "Then [the defendant] chose to drink, to get up his nerve, and he chose to drink not enough to interfere with his plan or the execution of it, just enough to embolden him. You have heard probably all you want to hear about how much the defendant drank that night or on other nights at the Malden Hospital. Suffice it to say that he had a high tolerance for alcohol. On April [second] of 2000 he was a .16 — contrary to what Dr. Perrine may wish you to believe, that some mathematical calculation is more important, more significant on how the alcohol affected the defendant that night.

> "You know that it is the witnesses who saw [the

defendant] on that night, who watched him walk and talk and how he was behaving. You know that they were in the best position to assess the effect that any alcohol had on that defendant, and you know, indeed, that that alcohol did not affect his ability to carry out his plan at all."

This was not a statement of the prosecutor's personal opinion regarding the effect the defendant's blood alcohol level of .16 would have had on his perception and judgment. The comment that "he had a high tolerance for alcohol" was a permissible inference from the evidence. The prosecutor agreed that the defendant had a .16 blood alcohol level at the time of the crime. But, she argued, all the witnesses who saw him when he was intoxicated to that degree testified that he was able to function normally. From the fact that he was functioning normally with a .16 blood alcohol level the inference is permissible that he had a high tolerance for alcohol. The evidence regarding the defendant's activities just before and after the murder (when he was intoxicated) justified such an assessment. The prosecutor's argument was that the jury should disregard the expert testimony on the issue and instead rely on eyewitness observations of the defendant's words and acts to determine his ability to perceive and make judgments at the time of the murder. She did this by making the above statement and then summarizing the eyewitness testimony that supported her contention: the defendant's conversation with the victim's father reminding him to pick up his wife just before the stabbing; the defendant's appropriate response to DeJesus's plea for mercy shortly after the stabbing and the defendant's explanation of his motives to the victim's brother soon thereafter.

6. *Relief pursuant to G. L. c. 278, § 33E.* After reviewing the entire record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to reduce the verdict to murder in the second degree.

*Judgments affirmed.*